Case number 15-3147, Larry Askins, et al. v. Ohio Environmental Protection Agency, et al. and United States Environmental Protection Agency. Argument not to exceed 15 minutes per side. Mr. Edwards, you may proceed for the appellants. Please, the Court, I would reserve five minutes for rebuttal. That's fine. There are two issues facing the Court. If this Court affirms the trial court, then the issue arises, how are you ever going to litigate this issue that we've brought to this attention of the Court? Because if you can't sue the United States EPA or the Ohio EPA or the Ohio Department of Agriculture about permits that shouldn't be issued, then they're just going to keep issuing the permits. If you can't get to the permit... Well, if they've issued a permit that they shouldn't have issued, then isn't it possible for you to go against that permit? That's what the whole thing is about, is a permit that's being violated. And if... At this stage, that would require close to 100 separate lawsuits because there are that many permit holders out there that have permits issued under this regulatory scheme. Well, the regulatory scheme, isn't that the problem, that what you're complaining about is the regulatory scheme when what this whole citizen suit system is about is a violation of one of the permits, not how the permit is issued? That's my question to you. Well, I think the case law supports the idea that the citizen supervision can even get at procedural flaws in the Clean Water Act. And what gets you there? What... Are you talking about Decker? No, I'm talking about... Ecological Rights Foundation versus Pacific Lumber. 230 Fed Third 1141, where it talks about even those that are purely procedural are grounds for a claim under the citizen's suit provision. Is that... That's a Ninth Circuit decision. Is that cited in your brief? It is on page 14 of my reply brief, Your Honor. The reply brief? The reply brief. All right, then I have another question before you get wound up. No, this is helpful. Well, maybe I'll wait. Maybe I'll just wait. You go ahead, because I think once you get into it, the question will be obvious. So if we can't sue the state of Ohio or the US EPA, then we're going to have to sue individual permit holders, as the judge has indicated. And that doesn't make any sense. I mean, if someone's issuing invalid permits, why should you have to wait until each individual permit is issued and then sue the permit holder? Well, that does raise the next question. In fact, Ohio is looking toward having the state issue the permits, but so far there are only federal permits being issued. I mean, the ones that are being issued are being correctly issued, are they not? I would disagree with that. The state of Ohio has been issuing the permits since 2001 or 2002 when the US EPA granted them the authority under 33 United States Code 1342 to administer the program in Ohio. These are the NPDES permits? Yes, these are the NPDES. Not the permits to install or permits to operate? No. These are the NPDES permits. Ohio EPA has been issuing those since 1972. In 2001, when a certain law was passed in Ohio, we believe that part of that NPDES program was transferred to the Ohio Department of Agriculture. But the Ohio Department of Agriculture is not issuing the permits. No, they are authorizing and approving a large segment of the permit in the manure management plan. When you're talking about these large, huge farms, you know, 50,000 chickens or 100,000 chickens, the manure management plan is the guts of the plan. And the Ohio Department of Agriculture regulates that, sets the regulations, collects the data, analyzes it. The Ohio Department of Agriculture defines manure management plans, and then the Ohio EPA merely reviews it and incorporates it. Well, where is a case that says that's an improper thing to do if the Ohio EPA is, in fact, still in control of the permit issuance? There is no case that I've ever found. All we're relying on is the language in the regulation, 40 CFR 123.62, which prohibits the transfer of any part of the program. It says the whole program or any part. And part can be a piece, a segment, a portion, any part of it that's transferred. You can't do that unless you get the U.S. EPA's permission. Council, does the- I'm sorry. Go ahead, Justice Donald. I was going to ask, Council, does the regulatory scheme that you refer to for the Clean Water Act compare to the regulatory scheme for the Clean Air Act? And if so, how do you differentiate this scheme from that in terms of the relief you're seeking? Well, as far as the citizen suit provision of the Clean Air Act versus the Clean Water Act, they are similar, but there are some differences as well as far as the parameters of each one. And the exact language is not identical, so there are some differences. Now, I'll be honest with you. I'm not prepared to discuss the language of the citizen suit in the Clean Air Act versus the language of the citizen suit provision in the Clean Water Act. There are some significant differences. There are a lot of similarities, too. I would agree with that, and I am mindful of this Court's decision in Sierra Club v. Kurleski that Judge Cole wrote a dissent in. I think there is a danger because that relied on the United States Supreme Court decision that it yet interpreted a different act. I think that was the Endangered Species Act. And then Sierra Club v. Kurleski was the Clean Air Act, and now we're in the Clean Water Act. And I think there is some danger in going from act to act to act and just carrying over the interpretations of citizen suit provision to citizen suit provision to citizen suit provision. So I am mindful there are some similarities, but I still come back to the idea that unless we're allowed to proceed, there is no way to bring this issue up unless, as was suggested, we go back and sue 50 to 100 individual permit holders. Let me just interrupt one second so I can make sure I understand the argument. And Judge Dommel, if I've interrupted you, please jump in after this question. So following up on Judge Daughtry's question, you agree, I take it, that the Ohio Department of Agriculture is not issuing these NPDES permits? Their name does not appear on the permit, yes. I would agree with that. Okay. And it seems that maybe part of the problem or your objection really is that the Department of Agriculture requires that these CAFFs, these C-A-F-F-Ss, submit these manure management plans. And then in the federal system, there is a requirement of the submission of, I think, it's a nutrient management plan or something to that effect. And under the overall scheme, the Ohio EPA will accept a copy or some version of the manure management plan that would have been prepared in the state. And you're arguing that somehow by the Ohio EPA accepting that, that they have somehow usurped the... Well, I think they violated 40 CFR 123.62 because it prohibits the transfer of any part of the NPDES program. If that's data gathering... Why is that transferring the program if they're simply accepting a manure management plan that is very similar to a nutrient management plan as part of the overall process that the Ohio EPA conducts in its evaluation of a permit application and then its issuance of an NPDES permit? Because the definition of a manure management plan is with the Ohio Department of Agriculture. The parameters, the forms, the collection of the data, the analysis, all that is with the Ohio Department of Agriculture. Well, somebody has to be boots on the ground. They're out there inspecting these things for other purposes, and the information they collect they're sending back to the Ohio EPA. Is that not correct? No, they're filling out a form for the Ohio Department of Agriculture. That was not my question. They're the people that are out there on the feedlots looking at what's going on for other purposes and collecting the data. Is that not correct? The Ohio Department of Agriculture employees, yes. So it's the Ohio Department of Agriculture that's doing all this work. That's transferring part of the program. And the reason it's so important is the Ohio Department of Agriculture's job is to promote agriculture. The Ohio Environmental Protection Agency's job is to protect the environment. That's why this whole switch occurred. Thank you. You'll still have your full five minutes of rebuttal. Thank you. May it please the Court. My name is Peter Krizwicki. I represent the United States Environmental Protection Agency. I will be using the first seven minutes of the time allotted to appellees, and I'd like to reserve the remaining eight minutes of the time for Counsel Kelly MacLeod for Ohio. Okay. That's fine. Your Honors, this case is straightforward. The district court correctly granted summary judgment to the United States Environmental Protection Agency for two reasons. First, there is not an applicable waiver of sovereign immunity. And second, Ohio has not transferred a part of its approved NPDES program. Turning to the first basis for affirming the district court, the only waiver of sovereign immunity the Askins seem to evoke is the Clean Water Act's citizen suit provisions, 33 U.S.C. Sections 1365a1 and a2. But none of their claims fall within the narrow confines of those provisions. The Askins do not assert a claim against the United States Environmental Protection Agency under 33 U.S.C. Section 1365a1, nor could they. This provision allows citizens to bring lawsuits against entities that violate effluent standards or limitations.  based on the alleged violations of terms or conditions of NPDES permits. But the Askins never allege that U.S. EPA holds or has violated an NPDES permit. Accordingly, the Askins have not established that the waiver of sovereign immunity in 33 U.S.C. Section 1365a1 applies to the United States Environmental Protection Agency. And I'm just wondering, what recourse do citizens have if the U.S. EPA consistently fails to initiate hearings against state agencies that do not follow NPDES requirements? The citizens can file a withdrawal petition if a state consistently fails to follow NPDES regulations. And that's the only recourse you're aware of? Well, so it's not the only recourse. As the colloquy before indicated, and I believe judges are aware, they can, if there are individual failures with permits, they can sue in state court to challenge those permits. Okay. Moving on to the waiver of sovereign immunity in 33 U.S.C. Section 1365a2, it does not apply because the text of that provision only permits suits against the United States Environmental Protection Agency when it fails to perform an active duty which is not discretionary. But the Askins have not identified a nondiscretionary duty that U.S. EPA has failed to perform. The Askins suggest that U.S. EPA has a mandatory duty to conduct a hearing to determine whether to withdraw a state's NPDES program whenever a state is not administering its approved program in accordance with the Clean Water Act. But the text of the Clean Water Act, its structure, the legislative history, and the weight of the authority all establish that U.S. EPA's decision to hold withdrawal hearings is discretionary. Accordingly, U.S. EPA's decision regarding whether to conduct a withdrawal hearing cannot form the basis of a citizen suit under 33 U.S.C. Section 1365. Counsel, could I ask you, isn't there a, the Ohio EPA has sought approval of permitting by the Ohio Department of Agriculture, and it's simply the case, as I understand it, that the U.S. EPA hasn't signed off on it yet? So I believe that the state of Ohio has sought to transfer the permitting authority, is that what you're referring to? Right. Yes, Your Honor, and it is currently the case that EPA has not signed off on it. Is there, wouldn't this problem go away if they did? Well, yes, Your Honor. This particular problem. Yes, Your Honor. Is there any chance that they're going to? Your Honor, this process takes a long time. It requires approval by the administrator. I don't know that it's going to happen in the near term. Well, hasn't the process been going on for nine years, since 2006? There's been an extensive back and forth, but U.S. EPA must follow the procedures it has set forth in 40 CFR 123-62, and so first, if they do decide, if they do propose to approve the plan, they have to submit that approval. And it's gone back and forth. So let me just ask this. Has that kind of approval come through in other states? Yes, Your Honor. Indeed, in Oklahoma, the relevant Department of Agriculture for Oklahoma does exactly what. Just Oklahoma or several other beyond Oklahoma? Oklahoma is the only one that I know of that I could offer as an example to this Court. Thank you. So accordingly, there is not a basis for a citizen suit under 33 U.S.C. section 1365A2. This Court should affirm the District Court's grant of summary judgment to U.S. EPA because there is no applicable waiver of sovereign immunity in this case. Turning to the second basis for affirming the District Court, the District Court correctly determined that the United States Environmental Protection Agency has never approved any transfer of a part of Ohio's NPDES program, as we just discussed, and Ohio has not transferred a part of its NPDES permit program from Ohio EPA to the Ohio Department of Agriculture. Well, there's something in the record that indicates that the people who were out inspecting to make sure that the effluvians weren't in violation of the Clean Water Act, that those boots-on-the-ground people used to work for the Ohio EPA and that that whole office got transferred to the Ohio Department of Agriculture, sort of envisioning that this transfer of permitting was going to be approved by the EPA. Am I wrong about that? There is a vague reference, and I can't tell you what it actually refers to, regarding who has various appropriations in the state of Ohio, but what I can say is that I believe it's page ID 523. There is an enforcement notice from Ohio EPA, and it is well after the time period when the alleged transfer were to have occurred, and in that it is quite clear that Ohio EPA still does indeed have boots-on-the-ground. Okay, thank you. 523? I believe page ID 523. There's a notice of violation. And ultimately, Your Honors, throughout my brief, I document that the Ohio Environmental Protection Agency is the only agency that is administering the NPDES program as that program is described by the Ohio submissions in the 1970s. Accordingly, if this court were to reach the merits of the district court's decision, it should affirm. Yeah, I would just make a comment just from me, not talking for the panel. It just seems I know there's a lot of process that goes into approval here in terms of transfer of authority. It just seems that there has to be a time at which this gets resolved, and this started in 2006, and I know draft proposals have gone back and forth, and U.S. EPA has reacted and required the applicant to supplement and revise the application. But I can't imagine that this scheme envisions a process that extends indefinitely. I mean, you don't have any sense today for when this may be resolved. I guess I'd just make the comment that it seems to me that EPA  of nine years from now we're not in the same position. Yeah, nine years is edging into immigration delay territory. I understand, Your Honor. I can't commit my client. I understand, but you can certainly carry the message back. I will do so. I'm currently out of time. Thank you very much. Thank you. Mr. McCloud? May it please the Court. My name is Kelly McCloud, and I represent the Ohio Department of Agriculture and the Ohio Environmental Protection Agency in this appeal. Both the Ohio Department of Agriculture and the Ohio Environmental Protection Agency respectfully request that this court affirm the judgment of the district court for several reasons. One is that the citizen supervision under the Clean Water Act, Section 505A1 that the plaintiffs have cited, that it does not authorize a citizen suit against the State of Ohio in their capacity as regulators. The second point is that the NPDES program has not been transferred from Ohio EPA over to ODA. And the third point is that ODA does not issue Clean Water Act permits. They only issue permits to install, permits to operate for the construction and day-to-day operation of the facility. Those are State permits, and they're not discharge permits. To the first point, Your Honor, the citizen suit of the Clean Water Act under Section 505A1, it authorizes a citizen suit against primarily a discharger who has violated an effluent limitation. In this particular instance, I mean, an effluent limitation is it's a control or a restriction on a discharge. And in this case, it is not the transfer of an NPDES permit. An effluent limitation, as I said, it controls the discharge. It's an obligation that's placed on the discharger to ensure that they follow the discharge limits to avoid or eliminate discharges. And again, the transfer of a program, it just doesn't equate to an effluent limitation under the Clean Water Act. Well, when you say transfer of the program, are you talking about this indication in the record that the inspection people that once worked for the Ohio EPA got transferred to the Ohio Department of Agriculture? Did that happen? I think that's the complaint here is that they've transferred, quote, part of the program, unquote. What happened, Your Honor, is when the CAFO law was passed, I mean, essentially what happened is for the PTI program that Ohio EPA used to issue just for the construction of the facilities, that part was transferred over. And then there were personnel, I don't know if personnel were actually transferred over, but there was appropriation for ODA to administer the program. I mean, there has to be funding. But essentially the reason that the program was transferred was because the Ohio EPA did not have the expertise to go out and to inspect. They inspected the facilities, but they didn't really have a lot of experience with livestock as opposed to ODA. And there were also other issues with permitting process. Sometimes an applicant would apply for a permit to Ohio EPA, and it would take maybe a year to get a PTI permit when ODA could do it much faster and, you know, less time. So that was one reason why or several reasons why the program was transferred. Expertise and efficiency is what you're telling me. Expertise and efficiency. And also this state at that time, there was an environmental crisis that had taken place at a large calf farm in Ohio. And Ohio EPA just did not have the regulations in place that would allow the state to fully regulate this facility and clear up these issues as much as ODA. So that kind of prompted the need to move the program over from Ohio EPA over to ODA because ODA just has more. And, Council, that language that you're using right now, I think actually speaks to some of the confusion because one of the things that the appellants say is that there are conflicting purposes for these two entities. One is to promote agriculture, which is what you've largely described, and the other is to protect the environment. And in describing them, I guess the functional process, you seem to describe something that would equate to some type of transfer which is what the appellants are arguing. And I guess I'm a little bit confused by part of the answer. And I understand that you're saying it's efficiency, but it does seem a little bit confusing. Well, Your Honor, the transfer was for regulatory purposes. I mean, it had nothing to do to promote the business of agriculture. It was to make sure that the environment is protected at these facilities because they generate so much waste. And one department, the Ohio Department of Agriculture, it was better equipped to deal with these issues, environmental issues, because that's what's being enforced here as an environmental statute. It's not the business of agriculture. But the Department of Agriculture is in the position to regulate these facilities much better than Ohio EPA has been. And that's one of the reasons for the transfer, if that answers your question, ma'am. Well, let me just get to the nitty-gritty. There hasn't been any violation that anybody can document of the Clean Water Act here itself. I mean, there's no discharge right now that is violating the Clean Water Act. So is this lawsuit, in your judgment, just an attack in general on the feedlots, on these big feedlots? Is that what these people are really unhappy about? In my opinion, yes, Your Honor. I mean, if I can explain it a bit further. There's been an extensive history of the Askins appealing permits that ODA has issued. Extensive. I mean, they have filed lawsuits. I mean, this is something that they have— So this is property owners near one of these big operations. Is that— I assume. I don't know. I mean, they live in a county where I guess there are some animal feeding facilities. It just seems to be just an attack against ODA and their regulations. Well, you can understand that you wouldn't be happy if one of these big operations moved in next door to you. It's that old not in my backyard kind of— I do understand that, Your Honor, but it does not mean that ODA has done anything illegal in terms of issuing permits or that Ohio EPA has done anything illegal. So, I mean, just— I mean, I wrapped up my point. I just want to wrap up the point about the lawsuit that— I mean, there's no effluent limitation violations in this case. And as far as the manure management plans are concerned, manure management plans, they contain best management practices that the facilities have to implement to try to control the manure that's at the facilities. Both Ohio EPA and ODA require these facilities to submit this information. This is site-specific information on how the facilities are going to prevent discharges. And there has been no—there is no delegation. Ohio EPA has not delegated authority to ODA to review these plans or to develop these plans. The CAFO develops it, and Ohio EPA has to review the plan and to make sure it complies with the Clean Water Act as well as the Ohio's water pollution control laws. So there has been no transfer in this case. So my time is up, but I will— Okay. Thank you, Mr. McCloud. And, Mr. Edwards, I think you have five minutes of rebuttal. Thank you. To get back to the question, we submitted an affidavit from a former EPA official. It's at page 874 of the record, where he documents that there was a transfer, a massive transfer of personnel from the Ohio Department of— Ohio Environmental Protection Agency to the Ohio Department of Agriculture. Those are the people doing the inspections, Ohio Department of Agriculture employees, and it's at page 874 in an affidavit form. Well, there's nothing in the law that says who has to do the inspection. But if the prohibition is transfer of any part of the program, it's not who issues the permits. It's transfer of any part. And data collection is a part of the NPDES. Forms, data collection, analysis, that is a part of the program. And we can see the success the Ohio Department of Agriculture has had in this. Look at Lake Erie. Half of Lake Erie every year is a green soup because of the manure that gets into the Maumee River and travels to Lake Erie. So to get up here and say the Ohio Department of Agriculture is concerned about the environment simply doesn't meet the facts and the reality. What I don't understand is why they aren't on our side of the table screaming about this to protect the environment. The affidavits of their own employees in this case state that the reason the transfer was made to address concerns by the livestock industry and legislature that Ohio EPA was not as responsive as desired and perhaps not best suited to regulate agriculture because they made agriculture obey the Clean Water Act. So they wanted somebody else who would be more favorable, who would promote agriculture, and that's what they got. And we are suffering the results of that in Lake Erie and the Maumee River, Grand Lakes, St. Mary's, and probably other lakes around Ohio. Now, basically what Ohio EPA has been reduced to doing is reviewing the work of the Ohio Department of Agriculture. They get this thing and they look at it and say, oh, okay, that's it. That's clearly not what the Code of Regulations provide. They are not to be put in a position of merely reviewing work of others. That has transferred part of the program. And this is the only way, this lawsuit is the only way to get at that issue. Now, there was something else brought up about the delay. This Act was passed in, I think, 2000, effective 2001. The Act required them to file the application within 180 days. It took four years. And then the comments, I think that was in the end of 2006, they received comments back from a Mr. Topla that's in the record. I think November of 2007, all right, it's almost eight years later. We're still waiting. I mean, this is silly, 14 years. So what happens if this comes back with not 30 areas of comments, but, say, 10 areas of comments? Are we going to wait another eight years and then maybe another four years? I mean, this can go on forever. I got the sense from the record that everybody seems to be getting close to having sort of a final application and final action by USPA, EPA, because hasn't the application been revised just as of a month or two ago? Yes. And it sort of responds to all the concerns that have been generated over the past eight or nine years. And we haven't seen it. And I don't think it's fair that that's being brought into the case because we haven't seen that application. What happens if there's 20 areas of concern now? And then it goes back and we have to wait another six years before they address those areas of concern. So we could be in something for a 20- or 30-year time period where we have the High Department of Agriculture actually doing the work and NPS just reviewing it, and that's it. I don't have anything else. Okay. Thank you. Thank you. We appreciate arguments from all council today. Thank you very much. The case will be submitted.